**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **3:23-CR-083** |
| v. | : | **(JUDGE MARIANI)** |
| | : | |
| **SANTINO BELLUCCI, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

Here, the Court considers the Motion to Suppress Search of Defendant's Cellular

Telephone (Doc. 109) filed by Defendant Santino Bellucci on October 17, 2023.  The

September 19, 2023, Superseding Indictment charges Defendant Bellucci and Christopher

Potter with Conspiracy to Distribute Controlled Substances Resulting in Death and

Distribution of a Controlled Substance Resulting in Death.  (Doc. 89 at 1-3.)  The

Superseding Indictment also charges Defendant Potter with Distribution of a Controlled

Substance, Possession with Intent to Distribute Controlled Substance and Maintaining

Drug-Involved Premises (*id.* at 4-5), and Defendant Bellucci with Conspiracy to Distribute

Controlled Substances (*id.* at 6).[1]

─────────────────

[1] Kaylee Ann Widmer was named as a defendant in the original Indictment filed on April 3, 2023.
(Doc. 1.)  She is not named in the Superseding Indictment.  (Doc. 89.)  In its opposition brief, the
Government notes that "[a] plea agreement was filed on behalf of Kaylee Ann Widmer prior to the return of
the superseding indictment.  (Doc. 74.)  She awaits a plea date and is not a named defendant in the
superseding indictment."  (Doc. 119 at 1 n.1.)

The initial event giving rise to the crimes charged occurred on December 19, 2022, when Corey Rinaldi, a twenty-six-year-old male, was found deceased in his bed in Dunmore, Pennsylvania.  (Doc. 112 at 2; Doc. 119 at 3.)  Following an investigation, law enforcement obtained an arrest warrant for Defendant Bellucci (hereinafter "Defendant") on February 28, 2023.  On the same date, Detective Michael Lydon of the Dunmore Police Department applied for a Search Warrant for Defendant's cellular telephone.

The validity of the Warrant for Defendant's cellular telephone is the subject of the pending motion.  Specifically, in the supporting brief accompanying his Motion, Defendant states that "[t]he evidence resulting from the search must be suppressed because the warrant was not sufficiently particular and because the affiant omitted material information from his affidavit of probable cause."  (Doc. 112 at 5.)   Defendant requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), on the issue of whether probable cause for the issuance of the warrant exists when the omitted information is considered. (Doc. 112 at 9.)  The Government filed an opposition brief on October 30, 2023.  (Doc. 112.) Defendant did not file a reply brief and the last date to do so was October 13, 2023. Therefore, this matter is ripe for disposition.  For the reasons that follow, Defendant's Motion will be denied.

## II. BACKGROUND

Because the determination of Defendant's motion depends on the information contained in the Application for Search Warrant and Affidavit of Probable Cause, this section will focus on the relevant portions of Detective Lydon's Affidavit.[2]

The Search Warrant Application identified the items to be searched:

> All user generated data stored on the handset, SIM card, and/or Micro SD card . . . including use information, image files, video files, ring tones, audio files, emails, websites visited, all call logs (incoming, outgoing, and missed), contact lists and/or phonebooks, Short Message Service (SMS) including . . . deleted message[s], and Multimedia Message Services (MMS). All data stored on a flash memory card from within the handset. Specifically in relation to the crime of Possession with Intent to Deliver.[3]

(Doc. 119-1 at 1, 10.)

The Affidavit of Probable Cause is over seven pages long. The Government provides an extensive summary of the information contained in the Affidavit. (Doc. 119 at

---

[2] In his supporting brief, Defendant states that "a portion of the Affidavit was redacted by the Government, and an unredacted version has not been provided to Defense Counsel, despite it being requested." (Doc. 112 at 3.) In its opposition brief, the Government states that,

> even with the redacted version attached by the defense, ample probable cause exists to search Bellucci's cellular phone. However, on October 20, 2023, the Government provided the defense with a less redacted version of the affidavit of probable cause (with only the name of two identified witnesses redacted – attached hereto as the "Search Warrant Affidavit") and asked if the defense wished to withdraw the motion. By email dated October 20, 2023, the defense indicated that it would not do so.

(Doc. 119 at 2.) As stated in the text, Defendant did not file a reply brief and the time for doing so has passed. Because Defendant had an opportunity to respond to the less-redacted version of the Affidavit and chose not to do so, the Court finds it appropriate to consider the less-redacted version of the Affidavit of Probable Cause attached to the Government's brief (Doc. 119-1) in analyzing the pending Motion and cites to that document in the Background section of this Memorandum Opinion.

[3] Ellipsis used in the quoted material indicates an undecipherable symbol.

16-24.)  Defendant does not dispute the accuracy of the summary of the Affidavit provided

by the Government.  *See supra* n.1.  Having verified the accuracy of the Government's

recitation, the Court repeats that summary here with limited additions set out in brackets

and italicized.[4]

> In the affidavit, the affiant first notes his training and experience as a criminal investigator assigned to the Criminal Investigation Division of the Dunmore Police Department. The affiant notes his employment as having spanned the previous 23 years and his experience in hundreds of criminal investigations, including the service of and participation in over 200 search warrants. *Affidavit* p. 2.

> The affidavit described how the deceased body of Corey Rinaldi was discovered by his father, Michael, early in the day on December 19, 2022. The bedroom in which Corey was discovered is described in the affidavit, including items of drug paraphernalia, including a rolled up dollar bill with visible white powder observed on it, a precursor of snorting various narcotics, as noted by the affiant. *Affidavit* p. 2-3. The affiant further notes a small area on top of a nearby dresser where white residue was located along with a small piece of white wax paper with a portion of colors and writing - noted by the affiant to be consistent with drug packaging. *Id.*

> The affidavit further included a detailed description of additional drug paraphernalia in the form of several open glassine packets that are commonly used to contain heroin/fentanyl. *Id.*

> The affidavit continued on to describe how Corey Rinaldi's cell phone was located alongside his deceased body, appearing that Corey was involved in a text thread prior to his passing. The affidavit documents that Corey's cell phone was taken into evidence. *Id.*

> The affidavit described the positioning and condition of Corey's body and noted the presence of lividity and pooling present on the body ["*as well as blood coming from the mouth. Deputy Coroner Jessie Van Deusen explained that physical signs noted when the victim was moved were commonly seen in*

---

[4]  Spelling and grammatical errors in direct quotes from the Affidavit are in the original.

*fatal drug overdoses but that a clear determination could not be made until a toxicology report was completed."  Affidavit pp. 2-3.*]

The affidavit described on-scene interviews with Corey's family members, including questioning involving Corey's drug use. Notably, family members reported, and it is documented in the affidavit, that on December 18, 2022, the day prior to his death, Corey met a male known to them as "Sandy" or "Santo" and they believed his last name was Bellucci. The affidavit details that family members reported that Corey met this male on the street in front of their residence on that date. *Affidavit* p. 4. [*The affidavit also states that "[t]he family explained that they know BELLUCCI to have supplied Corey with narcotics and Xanax in the past."  Id.*]

The affidavit includes a follow-up interview with Michael Rinaldi conducted on December 21, 2022, in an effort to obtain additional information about the death of his son, Corey, as noted by the affiant. The affidavit details specific information learned from Michael Rinaldi, including how he and Corey were planning to unlawfully obtain oxycodone on December 18, 2022. *Id.* . . . [T]he affidavit includes Michael Rinaldi's admissions that he spoke with Corey on December 18, 2022 about "Bellucci" coming to the residence to sell Corey one tablet of oxycodone. The affidavit further includes Michael Rinaldi's admissions that after unlawfully obtaining oxycodone from Bellucci, Corey intended to then distribute the oxycodone to him for his back pain. *Id.* The affidavit includes details from Michael Rinaldi about a phone call he had with Corey wherein Corey told Michael that he had taken some of that "powder" and that it helped Corey with his back pain. The affiant notes that Michael Rinaldi recalled Corey telling him that he had previously purchased "crushed" up oxycodone and that Corey referred to the crushed up oxycodone as powder. The affiant notes that Michael Rinaldi admitted that Corey told him he obtained "powder" from Bellucci on December 18, 2022 when he obtained the tablet of oxycodone. The affidavit includes the fact that Michael Rinaldi reported that he cautioned Corey about ingesting any powders and that Corey told Michael that it was fine and that he had purchased what he (Michael) assumed was crushed up oxycodone or "powder" from Bellucci previously. *Id.*

The [following are] specifics included in the affidavit:

Michael explained that in previous conversations with Corey, he had mentioned that BELLUCCI drives a red BMW and that was presently employed as a correctional officer.  Michael explained

that based on previous conversations with Corey he knew that
Corey was purchasing Xanax, they used to meet face to face.
Corey explained to Michael that once BELLUCCI's friend,
[redacted material] was arrested he became weary of meeting
face to face.  Michael explained that Corey would have to drive
to BELLUCCI's home in Dickson City to get the narcotics and the
BELLUCCI would leave them behand potted plants or
under/inside a gas grill located outside.

*Affidavit* p. 5.

The affiant then details in the affidavit that Michael Rinaldi advised that
Corey would communicate with Bellucci via telephone calls or text messages
when he was purchasing Xanax from Bellucci but more recently used Snapchat
to communicate. *Affidavit* p. 5. The affiant notes that based on his training,
knowledge and experience as an investigator, cellular telephones and their
applications have historically been used to establish the cost of narcotics,
amount to be purchased, locations and prices. *Id.*

The affidavit goes on to detail a January 26, 2023 interview conducted
with a female identified as Corey's girlfriend at the time of his death. The affiant
includes in detail what Corey's girlfriend (not Corey's dad – Michael) reported
about her last electronic communications with Corey, and included some of
those electronic communications in the affidavit:

[Redacted material] explained that on Sunday December 18th
2022 she received an unusual text message from Corey at
approximately 05:00HR.  Corey indicated that he was seeking
out pain medication for his father's chronic back pain.  [Redacted
material] responded that Corey's father needs fentanyl and
Corey replied "that's what I got him."  [Redacted material] asked
how he obtained it and from whom did he obtain it from.  Corey
stated "an old friend of mine Santino".  Corey indicated that "he
gave it to me he just dropped it off" and indicated that he obtained
the fentanyl to help his dad walk.  As this point [redacted
material] explained that she assumed that Corey had obtained a
fentanyl subdermal patch for his father and not another form.
[Redacted material] cautioned Corey to make sure it is fentanyl
and Corey replied "oh it is, he doesn't fuck around with that stuff
his brother died from laced drugs".  Corey went on to say "the

only person I'll ever trust with any type of street drug" and "he has every test kit that they make I think". Corey went on to explain that he was the only person who did not bully Santino's little brother on the golf team so "he takes care of my dad when he needs it". Corey explains that "it was a patch idt (sic) and sealed". Corey indicated that his father, Michael Rinaldi, woke him up calling him crying that Corey had to do something. Corey explained he was desperate for his father and panicked when he woke him up at 5am crying. [Redacted material] indicated that Corey's father needs pain management and possibly stronger prescription medication to manage his pain. Corey agrees but says "but I would trust Tino with fucking heroin he's so smart with the stuff he gets because he lost his brother to laced percs". [Redacted material] recommends this father take a certain prescription and Corey explains that his father was starting a 24 hour shift now and the he was running "the patch" to the firehouse. Corey continues by saying "I'm gonna try to get him that later today if my Chime money hits its very expensive". During that text thread [redacted material] would later indicate that she was home and Corey acknowledged at 11:30HR.[5]

*Affidavit* p. 6.

[*The affidavit includes information about securing a search warrant for the content and data of Corey Rinaldi's cell phone. The warrant was granted on January 4, 2023, and, thereafter, the affiant did a physical extraction of content and data contained on the phone. Id. The affiant states "[t]his investigator located two contacts in Rinaldi's phone for a person named 'Tino' [and] [a]s part of the investigation, this investigator is aware that Rinaldi refers to Santino BELLUCCI as "Tino" in at least one instance." Id.*] . . . The affiant notes the number assigned to Bellucci in Corey's cell phone as 321-443-2092. The affidavit details how law enforcement further noted in Corey's cell phone that there was an outgoing call from Corey to Bellucci's number (321-443-2092) on December 17, 2022 which lasted about four seconds. The affiant notes that Corey's entire call log was photographed, along with his entire contact list. It is noted in the affidavit that Corey had the Snapchat application on his phone, consistent with what had been reported by Michael Rinaldi. Notably, the

---

[5] This paragraph is the portion of the Affidavit previously redacted but which was provided to Defendant on October 29, 2023. *See supra* n.2.

affidavit details that upon opening the Snapchat application on Corey's cell phone, user name "Santino Bellucci" or "sbellucci" was the last Snapchat conversation that Corey opened prior to his death. *Affidavit* p. 7.

    . . . [T]he affidavit includes the following detailed electronic communications between Corey and Michael Rinaldi in the days preceding Corey's death:

> This investigator also reviewed a text message thread between Corey Rinaldi and his father, Michael Rinaldi which was reviewed from December 12th 2022 to December 19th 2022. On Saturday December 17th at 15:06HR Corey asks Michael via text message "do you have money for perks" and Michael replies that he doesn't and only has forty dollars. Corey states "Ok cause I can get them". It should be noted that this was four minutes prior to the telephone call with BELLUCCI. Michael asked Corey "is it off same guy u use to get them" and Corey replies "yeah". Michael texts "tell him to hold some unit we get money and Corey replies "Ok". At 16:29HR Mike texts Corey "thanks maybe I can sleep tonight" to which Corey replies "no problem"

> On Sunday December 18th at 05:37HR Corey texts Michael "Did that help you sleep at all last night" and Michael states "No I'm in so much pain I can't get out of my truck" "I don't know what to do", Corey asked Michael if he's working and he indicates that he is and that he is "fucked". Corey states "Do you want another one I'll have one left" and Michael states that he will take it if Corey doesn't mind and Michael says "I'll make sure I get u more than last time". Corey replies that Michael needs it more than he does and states "I'm gonna try to get some more of those and those bags today they bags were unreal my cyst pain was gone".

> On Sunday December 18th 2022 at 05:55HR he sent Michael a text message "Here". Corey then begins to send Michael, via text message Geisinger providers for pain management and at 06:51HR Michael texts Corey "Well I need to just get through today without dying" and Corey replies "I'm trying my best to get you stuff" At 10:54HR Corey texts Michael "did that help you" and Michael states "just a little it's back to

extreme pain" Corey explains that "I'm trying to get them he's not answering now".  Michael tells Corey no to kill himself and that if he gets a call he's going to end up going to the hospital.  On Sunday December 18th 2022 at 14:20HR Corey texts Michael "getting those in about an hour" and Michael responds "don't take that much of that stuff at once".  Corey responds "I know dad I'm not an idiot with opioids.  Maybe Xanax but not opioids."

On December 18th 2022 Corey texts Michael about having money for a coffee and at 15:29HR texts "Ill pull in front of the garage" and "OK here" this coincides with roughly exactly a one hour discrepancy.  The following text from Corey to Michael states "there's not a lot in the bag they're strong barely pour any out" and Michael replies "Ok I'm not talking it until later please be smart and I'll get u back".  Corey then states "Ok only tried it I'll let you know how strong it is".  Corey goes onto say "you can take a full one now it's like taking two percs" and Michael indicates that he will wait until later when he is ready to lay down.  At 16:00HR Corey texts "I can get you another one for later I'd rather see you not be in pain and I can guarantee it'll take the pain away" and Michael states "I just took that perc" and Corey replies "you can take both".  Michael inquires if "it" still strong and Corey replies "yeah itll take the pain way I feel like a million bucks now I can actually move my head".  Mike then indicates that he will do "it" later.  On December 18th 2022 at 17:32HR Corey states "That lasts a lot longer than the one I had last night" and states "they're really good".  Corey goes on to explain it will help Michael and that he won't feel any pain.  At 20:20 HR Corey asked Michael if he tried and Michael indicated that he did and it didn't help.  Corey states "are you serious there's nothing stronger than that".  Michael then indicates that he is going to lie down.

*Affidavit*, p. 8.

. . . [T]he affidavit details the finding within Corey's cell phone of two Zelle transactions involving electronic payments made to Bellucci by Corey. The affidavit first documents a Zelle payment made to Bellucci by Corey on December 17, 2022 in the amount of $40. The second Zelle electronic payment

to Bellucci from Corey, also documented in the affidavit, is reported as having occurred on December 18, 2022 in the amount of $120. Affidavit p. 8.

(Doc. 119 at 16-24.)

### III. ANALYSIS

The Fourth Amendment guarantees

[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "To find probable cause to search, there needs to be a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause is a "fluid concept" that is fact-specific and 'not readily, or even usefully, reduced to a neat set of legal rules.'" *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993) (quoting *Gates*, 462 U.S. at 232).

Where, as here, a court is presented with a challenge to a judge's probable cause determination in the issuance of a warrant, it must limit its review to an inquiry of whether "the magistrate had a substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 238-39. "A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Id.* at 236. The court must read the affidavit of probable cause submitted in support of the search warrant in its entirety and "in a commonsense and nontechnical manner." *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000) (citing

10

*United States v. Conley*, 4 F.3d 1200, 1206 (3d Cir 1993)).  "In making this determination, the Court confines itself 'to the facts that were before the magistrate judge, i.e., the affidavit, and [does] not consider information from other portions of the record.'"  *Id.* (quoting *Jones*, 994 F.2d at 1055).

Defendant raises multiple grounds for suppression in his supporting brief: the Warrant was general, overbroad, and lacked particularity, and the Warrant lacked probable cause because material information was omitted. (Doc. 112 at 5-9.)  Defendant asserts that he is entitled to a *Franks* hearing on the issue of probable cause.  (*Id.* at 9.)

**a. General Warrants, Particularity and Overbreadth**

According to Defendant, "[t]he warrant essentially allowed for the search of the entire contents of a cellular phone without limit." (Doc. 112 at 6.)  The Court concludes that the warrant appropriately limited the search of the cell phone.

"General warrants violate the Fourth Amendment because they essentially authorize 'a general exploratory rummaging in a person's belongings.'" *United States v. Yusuf*, 461 F.3d 374, 393 (3d Cir. 2006) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)); *see also Andresen v. Maryland*, 427 U.S. 463, 480 (1976).  Pursuant to the Fourth Amendment, "'a warrant may not be issued unless . . . the scope of the authorized search is set out with particularity.'" *United States v. Fattah*, 858 F.3d 801, 819 (3d Cir. 2019) (quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011)).

> Particularity has three components: "First, a warrant must identify the specific offense for which the police have established probable cause.  Second, a

11

warrant must describe the place to be searched.  Third, the warrant must specify the items to be seized by their relation to designated crimes."  *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013) (citations omitted). Ultimately, the particularity requirement intends that 'nothing is left to the discretion of the officer executing the warrant."  *Marron* [*v. United States*, 275 U.S. 192, 196 (1927)].

*United States v. Perez*, 712 F. App'x 136, 138-39 (3d Cir. 2017).

An overly broad warrant "'describe[s] in both specific and inclusive generic terms what is to be seized,' but [also] authorizes the seizure of items as to which there is no probable cause." *United States v. Karrer*, 460 F. App'x 157, 162 (3d Cir. 2012) (quoting *United States v. Ninety–Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents ($92,422.57),* 307 F.3d 137, 149 (3d Cir. 2002) (internal quotation omitted)).  As set out above, probable cause exists where the totality of the circumstances supports a finding that "there is a fair probability that contraband or evidence of a crime will be found in a particular place" and the deferential review of the district court is simply to ensure that the magistrate had a "substantial basis" for the conclusion that probable cause existed.  *Gates,* 462 U.S at 238-39.

Karrer explained that a warrant was not overbroad

simply because the devices and files it authorized to be searched and seized were likely to include materials unrelated to [the offense identified in the warrant]. "[A]s a practical matter, when a search requires review of a large collection of items, ... 'it is certain that some innocuous [items] will be examined, at least cursorily, in order to determine whether they are, in fact, among those [items] authorized to be seized.'" [*United States v. Stabile,* 633 F.3d 219, 234 (3d Cir. 2011)] (quoting *Andresen* [*v. State of Maryland,* 427 U.S. 463, 482 n.11 (1976)] (citation and internal quotation marks omitted).

460 F. Appx. at 162.

Further, "because criminals can—and often do—hide, mislabel, or manipulate files to conceal criminal activity, a broad, expansive search of [digitally stored information] may be required." *Stabile*, 633 F.3d at 237; *see also Yusuf,* 461 F.3d at 395 ("[T]he breadth of items to be searched depends upon the particular factual context of each case and also the information available to the investigating agent that could limit the search at the time the warrant application is given to the magistrate."); [*United States* v. *Christine,* 687 F.2d 749, 760 (3d Cir. 1982)] ("[T]he use of generic classifications in a warrant is acceptable when a more precise description is not feasible."). In considering the defendant's overbreadth argument in *Karrer*, the Circuit panel noted the applicability of the Supreme Court's statement that "'[t]echnical requirements of elaborate specificity . . . have no proper place in this area.'" *Karrer*, 460 F. App'x at 163 (quoting *United States v. Ventresca,* 380 U.S. 102, 108 (1965)).

Before applying these legal principles to the Warrant at issue, the Court notes that Defendant cites only one district court case in support of the proposition that the scope of the Warrant violates the Fourth Amendment. (Doc. 112 at 6-7.) According to Defendant, *United State v. Wecht*, 619 F. Supp. 2d 213 (W.D. Pa. 2009), dealt with the "search of everything on a computer without probable cause" and the court found the warrant to be overbroad and invalid. (*See id.*) In *Wecht*, "the Laptop Warrant's directive [was] to seize 'all information and data' contained in the computer hard-drive and associated storage

13

devices."  619 F. Supp. 2d at 250 (citing *Lesoine v. County of Lackawanna,* 77 F. App'x. 74,

79 (3d Cir.2003) (warrant authorizing the blanket seizure of, among other things, business

records and computer records without any reference to the crime under investigation failed

the particularity requirement); *United States v. Fleet Management,* 521 F. Supp. 2d 436,

442–46 (E.D.Pa.2007) (invalidating a warrant which authorized the seizure of "any and all

data" from three seized computers); *United States v. Slaey,* 433 F. Supp. 2d 494, 500–01

(E.D. Pa. 2006) (warrant authorizing the seizure of "[a]ny records, documents, materials and

files maintained on a computer" found to be facially overbroad where it lacked any limitation

as to subject matter and time, and thereby exceeded the scope of the probable cause

affidavit).

     *Wecht* and the cases upon which it relies are readily distinguishable.  As set out

above, *see supra* p. 3, the Warrant in this case identifies with specificity the "items to be

searched for and seized." (Doc. 119-1 at 1, 10.)  The Warrant also satisfies the other

requirements identified in *Perez*, 712 F. App'x at 138-39: the Warrant specifies the offense

for which the police state they have established probable cause and it specifies the items to

be seized by their relation to the designated crime with the inclusion of the language

"[s]pecifically in relation to the crime of Possession with Intent to Deliver" at the end of the

identification section (*id.* at 10.).  Thus, the Warrant at issue is not a general warrant lacking

in particularity.

In *United States v. Gorny*, Crim. No. 13-70, 2014 WL 2860637 (W.D. Pa. June 23,

2014), the District Court analyzed a defendant's claim of overbreadth where the warrants for

cell phones were sought for the purpose of investigating alleged violations including

possession with intent to deliver controlled substances. The warrant contained language

similar to that at issue here regarding the items to be searched and seized:

> information stored within the body of the phone to include, but not limited to,
> the telephone number, direct connect number, carrier IP number, voice mail
> contents, incoming and outgoing text and picture messages, phonebook
> contents or contact list, incoming and outgoing call information, as well as any
> photos or videos.

*Gorny,* 2014 WL 2860637, at *8.  *Gorny* noted that the affiants were aware that the

defendant used his cell phone to conduct deals, and the affiants were aware of the ways in

which drug dealers used their phones.  *Id.*  On these facts, the court found that the scope of

the warrants was not overbroad.  *Id.* at *9.

The Court reaches the same conclusion under the similar circumstances presented

here.  The Court also finds that the extent of the search and seizure authorized is supported

by the Affiant's identification of the use of Defendant's cell phone in illegal drug transactions

(Doc. 119-1 at 5-8) and his knowledge based on training and experience of how cell phones

have been used in the context of selling and buying drugs illegally (*id.* at 5).

Defendant's general assertions do not show that the Warrant was a general warrant

lacking particularity or was overbroad.  Although Defendant does not delineate his general

warrant, particularity, and overbreadth claims (*see* Doc. 112 at 6-7), he asserts, relying on

*Wecht*, that the Warrant at issue "essentially allowed for the search of the entire contents of a cellular phone without limit" (*id.* at 7).  For the reasons set out above, the Court disagrees.

Further, Defendant's identification of specific problems with the language of the Warrant does not advance his position.  Defendant points to the facts that the Warrant allows for the search of "ring tones" and "all data stored on a flash memory card within the handset" as indicative of a Fourth Amendment violation.  (*Id.*).  Regarding the flash memory card, Defendant ignores the fact that, immediately following "[a]ll data stored on a flash memory card within the handset," the Warrant adds the language "[s]pecifically in relation to the crime of Possession with Intent to Deliver" (*id.* at 10).  Regarding Defendant's assertion that there could be no potential evidentiary value in ring tones (Doc. 112 at 7), the Court notes that cell phones can be set with a special ring tone associated with certain individuals or groups of individuals, e.g., drug suppliers or clients.  *See Minto v. United States*, Nos. 2:05-CR-22, 2:09-CV-114, 2011 WL 6180111, at *4 (E.D. Tenn. Dec. 13, 2011).  Thus, ring tones could be of evidentiary value related to the charge of Possession with Intent identified in the Warrant (*id.* at 1).

Based on these findings as to Defendant's specific assertions together with the numerous instances in the Affidavit where Defendant's cell phone was implicated in the Decedent's procurement of drugs (*see* Doc. 119-1 at 5-8) and the Affidavit's explanation of the historical use of cell phones in the trafficking of drugs (id. at 5), the Court finds no grounds upon which to conclude that the Warrant is overbroad.

Because the Court has determined that the Warrant is not a general warrant lacking in particularity and is not overbroad, Defendant's request to suppress the search of Defendant's cell phone on these bases will be denied.

**b. *Franks* Analysis**

Defendant asserts that the credibility of Decedent's father, Michael Rinaldi, was essential to finding probable cause and the Court should hold a *Franks* hearing because material omitted reflected directly on Michael Rinaldi's credibility.  (Doc. 112 at 9.)  This assessment is based on the premise that "the entire determination of probable cause rested on information garnered from police from Defendant's father Michael [and], [a]bsent what he told them, probable cause could not have been established."  (*Id*.)  The Court disagrees with the premise and the conclusions derived therefrom.

In *Franks v. Delaware*, 438 U.S. 154 (1978), the United States Supreme Court held:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.  In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks*, 438 U.S. at 155-56.  Thus, *Franks* established a two-part test to allow a defendant to overcome the presumption that an affidavit of probable cause supporting a search

warrant is valid.  *Yusuf*, 461 F.3d at 383.  First, a criminal defendant must make a

"substantial preliminary showing" to overcome the presumption that the affidavit supporting

the search warrant is valid.  *Id.*  Only if this initial showing is made is a defendant entitled to

a *Franks* hearing.  *Id.*

> *Franks* elucidated the initial showing required:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.  Allegations of negligence or innocent mistake are insufficient . . . Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Franks*, 438 U.S. at 171-72.  To overcome the presumption of validity a defendant must do

more than construct a self-serving statement which refutes the warrant affidavit.  *Id.* at 171;

*United States v. Strube*, 1997 WL 33482969, at *3 (M.D. Pa. July 24, 1997) (supporting

statements from the defendant and his wife self-serving).

> In determining whether a statement was recklessly made,

> the rule is that an assertion is made with reckless disregard when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.  This definition provides two distinct ways in which conduct can be found reckless: either the affiant actually entertained serious

doubts; or obvious reasons existed for him to do so, such that the finder of fact
can infer a subjectively reckless state of mind.

*United States v. Brown*, 631 F.3d 638, 645 (3d Cir. 2011) (internal citations and quotations

omitted).  Similarly, omissions are made with reckless disregard for the truth "if an officer

withholds a fact in his ken that 'any reasonable person would have known that this was the

kind of thing the judge would wish to know.'"  *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir.

2000) (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).  An omission

or assertion is "material" when "probable cause does not exist under the corrected affidavit."

*Yusuf*, 461 F.3d at 383.

　　　In sum, a defendant must "allege with specificity what was false in the affidavit, must

provide proof, must allege that the affiant had a culpable state of mind, and must allege that

the remaining information is insufficient to support a finding of probable cause."  *United

States v. Yokshan*, 431 F. App'x 170, 173 (3d Cir. 2011) (citing *Franks*, 438 U.S. at 171-72).

　　　Here, Defendant does not and cannot make the requisite showing.  As noted

previously, Defendant alleges in a conclusory manner that (1) Michael Rinaldi met with

police officers numerous times before the December 21, 2022, meeting and lied at those

meetings, (2) Michael Rinaldi's credibility was essential to the finding of probable cause,

and (3) the material omitted reflected directly on Michael Rinaldi's credibility.  (Doc. 112 at

9.)

　　　As a threshold matter, these allegations do not show entitlement to a *Franks* hearing

because they are presented in a conclusory manner, i.e., Defendant provides no support for

any assertion made.  Defendant does not identify the meetings which allegedly took place before the December 21st meeting at the Dunmore Police Station.  Defendant does not identify lies allegedly told by Michael Rinaldi at those meetings or otherwise provide a substantive basis to undermine Michael Rinaldi's credibility.  Defendant does not state why Michael Rinaldi's credibility was essential to the finding of probable cause and does not state that the Affidavit contains false information or an inconsistency regarding information provided by Michael Rinaldi.  Even assuming *arguendo* that additional meetings took place at which Michael Rinaldi provided false information that was not included in the Affidavit, Defendant provides no support for his conclusion that the omission was material.  In sum, Defendant fails to make the initial showing required to show entitlement to an evidentiary hearing, *see supra* pp. 17-19, and his Motion will be denied on this basis.

The Court further finds that Defendant could not make the requisite showing in that the summary of the Affidavit set out above unequivocally shows that probable cause existed for the issuance of the warrant.  This is so whether the Court considers the less-redacted version, the redacted version upon which Defendant's Motion is based, or the Affidavit absent information from the Affiant's December 21, 2022, meeting with Michael Rinaldi and the January 26, 2023, meeting with the witness who had been in contact with Corey Rinaldi shortly before his death.

The frivolous nature of Defendant's Motion regarding probable cause is best illustrated by consideration of the Affidavit with the information from the December 21, 2022,

and January 26, 2023, meetings set aside.  Absent this information, the Affidavit clearly

provides probable cause for the Warrant for the reasons that follow.

The indices of drug involvement in the death of Corey Rinaldi were apparent to the

Affiant upon entry into the Decedent's bedroom when he responded to a request that he

proceed to the scene and further investigate.  (Doc. 119-1 at 2-3.)  Rinaldi's cell phone was

lying on the bed next to him and it appeared that he had been involved in a text thread prior

to his death.  (*Id*. at 3.)  The phone was seized as evidence.  (*Id*.)  Physical signs present on

the body were commonly seen in drug overdose cases.  (*Id*.)

The Affiant met with the family at the scene and, as set out in the Affidavit, they

explained on or around December 18th 2022 they were aware that the victim
met a male whose first name was "Sandy" or "Santo" and they believed his last
name was "BELLUCCI".  The family explained that this person met Corey on
the street in front of their home where he purchased a golf club.  The family
explained that they know BELLUCCI to have supplied Corey with narcotics and
Xanax bars in the past.

(Doc. 119-1 at 4.)   Eliminating the information about the Affiant's December 21, 2022,

meeting with Michael Rinaldi at Dunmore Police Headquarters and the Affiant's meeting on

January 26, 2023, with an additional witness (*see* Doc. 119-1 at 4-6), the Affidavit proceeds

to review the results of the extraction of content and data from Decedent's cell phone

conducted following the issuance of a search warrant for the content and data contained in

the phone (*id*. at 6).  Stating that, as part of the investigation, he became aware that Corey

Rinaldi referred to Santino Bellucci as "Tino" in at least one instance, the Affiant found a

telephone number assigned to the contact.  (*Id*.)  He found an outgoing call on December

17, 2022, at 15:10HR. (*Id*. at 7.) The Affidavit notes that Corey Rinaldi did not make or

receive a call from anyone other than close friends or family (with the implied timeframe

being from the call on December 17th to Rinaldi's death on December 19, 2022.) (*Id*.) On

the phone's Snapchat application, the Affiant opened the chat log and found that user name

"Santino Bellucci" or "sbellucci" was the last Snapchat conversation that Corey Rinaldi had

opened. (*Id*.)

The Affidavit identified information gleaned from a text message thread between

Corey and Michael Rinaldi stating that

> on Saturday December 17th at 15:06HR Corey asks Michael via text message
> "do you have money for perks" and Michael replies that he doesn't and only
> has forty dollars. Corey states "Ok cause I can get them". It should be noted
> that this was four minutes prior to the telephone call with BELLUCCI. Michael
> asked Corey "is it off same guy u use to get them" and Corey replies "yeah".
> Michael texts "tell him to hold some unit we get money and Corey replies "Ok".

(Doc. 119-1 at 7.) Thereafter, the thread discusses whether the drugs helped Michael's

pain, the procurement of more drugs, and the potency of the drugs. (*Id.* at 7-8.)

The Affidavit also details the finding on Corey Rinaldi's phone of two Zelle

transactions involving electronic payments he made to Defendant. (Doc. 119-1 at 8.) The

Affidavit first documents a Zelle payment made to Defendant on December 17, 2022, in the

amount of $40. (*Id*.) The second Zelle electronic payment to Defendant, also documented

in the Affidavit, is reported as having occurred on December 18, 2022, in the amount of

$120. (*Id*.)

To summarize, the foregoing information shows that Defendant is initially implicated

in the sale of controlled substances to Corey Rinaldi by the family shortly after Corey's death on December 19, 2022, at which time the family also identified an in-person contact between Defendant and Corey on December 18, 2022, the day before Corey's death. Defendant's contact information was found on the Decedent's phone with an outgoing call to Defendant's phone number on December 17, 2022, and a Snapchat conversation between Defendant and Corey Rinaldi which was the last Snapchat conversation Corey had opened. The family having established that Defendant had supplied the Decedent with drugs in the past, Defendant is implicated in the text thread between Corey and his father on December 17, 2022, when, shortly before his call to Defendant, Corey confirms that he is getting drugs from the same person from whom he "use[d] to get them" (Doc. 119-1 at 7).  Finally, the Decedent transferred money to Defendant on December 17, 2022, and December 18, 2022.

    Considering the totality of the circumstances set out above, there is no doubt that the relevant information establishes "there is a fair probability that contraband or evidence of a crime will be found in a particular place," *Gates,* 462 U.S. at 238, i.e., on Defendant's cell phone.  Therefore, if the Affidavit had not included information gleaned from the December 21, 2022, meeting with Michael Rinaldi and the January 26, 2023, meeting with another witness, the issuing District Magistrate Judge would have had a substantial basis for concluding that probable cause existed.  *Gates*, 462 U.S. at 238-39.

    This analysis clearly demonstrates that Defendant's assertion that information provided to investigators by Michael Rinaldi is essential to a finding of probable cause (Doc.

23

112 at 9) is disingenuous at best.  The Court further finds it more egregious that Defendant

was unwilling to reconsider his position on the issue of probable cause after being provided

the less-redacted version of the Affidavit, *see supra* p. 3 n.2., in that his supporting brief

contains arguments regarding probable cause that have no evidentiary support and this

transgression is magnified by Defendant's failure to recognize that the less-redacted version

contained significant information unequivocally supporting the propriety of the District

Magistrate Judge's finding of probable cause.

## IV. Conclusion

For the foregoing reasons, Defendant's Motion to Suppress Search of Defendant's

Cellular Telephone (Doc. 109) will be denied.  A separate Order will be entered.

Robert D. Mariani
United States District Judge