THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** : | |
| : | **3:23-CR-083** |
| v. : | **(JUDGE MARIANI)** |
| : | |
| **SANTINO BELLUCCI, et al.,** : | |
| : | |
| **Defendants.** : | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Defendant Santino Bellucci's Motion to Suppress Defendant's Statements (Doc. 108) is pending before the Court. With the Motion, Defendant Bellucci requests that the Court suppress incriminating statements he made to law enforcement following his arrest on February 28, 2023. (*See, e.g.*, Doc. 111 at 6-7.) Upon completion of the initial briefing of the Motion (Docs. 108, 111, 120, 127), the Court scheduled an evidentiary hearing for March 13, 2024. (Doc. 129.) At the outset of the evidentiary hearing, the Court noted that the resolution of whether the incriminating statements should be suppressed hinged on whether Bellucci was *Mirandized* before he made initial statements to law enforcement and that this determination was a matter of credibility since Bellucci contends he was not read his *Miranda* rights before he made incriminating statements and law enforcement on the scene say the opposite. (Evidentiary Hearing Transcript ("Hr'g Tr.") 4:1-6, Doc 154 at 4.)

The parties have now filed their post-hearing briefs. (Docs. 155, 156.) Bellucci asserts that the Government has not satisfied its burden of proving by a preponderance of

the evidence that he "was actually *Mirandized* in a police vehicle after being arrested" because the officers who testified at the hearing were not credible and the testimony and video related to an initial *Miranda* warning is not sufficiently compelling. (Doc. 155 at 1-6.) The Government responds that trial testimony and language contained in the audio and video recording of Bellucci's post-*Miranda* interview show that Bellucci was *Mirandized* before he made incriminating statements. (Doc. 156 at 2-6.) For the reasons set forth below, the Motion to Suppress Defendant's Statements (Doc. 108) will be denied.

## II. BACKGROUND

The September 19, 2023, Superseding Indictment charges Santino Bellucci and Christopher Potter with Conspiracy to Distribute Controlled Substances Resulting in Death and Distribution of a Controlled Substance Resulting in Death. (Doc. 89 at 1-3.) The Superseding Indictment also charges Defendant Potter with Distribution of a Controlled Substance, Possession with Intent to Distribute Controlled Substance and Maintaining Drug-Involved Premises (*id.* at 4-5), and Defendant Bellucci with Conspiracy to Distribute Controlled Substances (*id.* at 6).[1]

The initial event giving rise to the crimes charged occurred on December 19, 2022, when Corey Rinaldi, a twenty-six-year-old male, was found deceased in his bed in Dunmore, Pennsylvania. (Doc. 112 at 2; Doc. 119 at 3.) Autopsy and toxicology reports

---

[1] Kaylee Ann Widmer was named as a defendant in the original Indictment filed on April 3, 2023. (Doc. 1.) She is not named in the Superseding Indictment (Doc. 89) because a plea agreement was filed on her behalf prior to the return of the Superseding Indictment. (*See, e.g.,* Doc. 119 at 1 n.1.) Widmer pled guilty on January 19, 2024, and awaits sentencing. (*See* Doc. 138.)

indicated that Corey Rinaldi died of a fentanyl overdose. (*See, e.g.*, Doc. 120 at 3.) The police investigation that followed determined that a drug conspiracy involving Kaylee Ann Widmer, Santino Bellucci, and Christopher Richard Potter was the source of the fentanyl sold by Bellucci to Corey Rinaldi on December 18, 2022 which resulted in his death. (*Id.*)

After further investigation, law enforcement obtained an arrest warrant for Defendant Bellucci on February 28, 2023. (Doc. 111 at 1.) On the same date, Bellucci was stopped by members of the Pennsylvania State Police and arrested. (*Id.* at 2.) Following his arrest, Bellucci was placed in a police vehicle and asked questions about Corey Rinaldi's death. (*Id.*) Bellucci made incriminating statements at the time, including an admission that he supplied narcotics to Corey Rinaldi near the time of his death. (*Id.*)

Following the investigation, Bellucci was transported to the Lackawanna County District Attorney's office where a recorded interview took place. (*Id.*) During the interview, Bellucci admitted to the same conduct he had admitted in the vehicle and expanded upon his earlier statement. (*Id.*)

Santino Bellucci and three law enforcement officers who took part in the arrest testified at the evidentiary hearing. Detective Michael Lydon, Detective Corey Condrad and Task Force Officer Christopher Shelly testified about Bellucci's arrest and whether he was *Mirandized* before he made incriminating statements.[2] The three officers testified that

---

[2] Defendant Bellucci refers to Detective Condrad as Detective Conrad. (*See, e.g.*, Doc. 155 at 2.) Task Force Officer Shelly is often referred to as "Detective Shelly" in briefing and at the hearing. (*See, e.g.*, Doc. 155 at 3, Doc. 154 at 13, Doc. 156 at 5.)

Bellucci was *Mirandized* in the backseat of the police vehicle where he was placed after his his arrest. (*See, e.g.*, Hr'g Tr. 13:19-14:5, 45:2-24, 63:3-21.) Bellucci testified that, while he was in the backseat of the car, he was told only that he did not have to speak with law enforcement if he did not want to, he was not advised about his right to an attorney, and he was not advised that he could stop the interview at any time. (Hr'g Tr. 77:24-78:15.)

During his testimony, Detective Lydon provided background of the lead up to the arrest and his involvement at the scene which began after Bellucci had been taken out of his car and handcuffed by members of the state police. (Hr'g Tr. 5:19-10:10.) Lydon testified that he provided Bellucci with initial information about his arrest and walked with him back to Detective Zech's vehicle. (Hr'g Tr. 10:14-11:20.) When asked "What happened next?" by the Government's attorney (Hr'g Tr. 12:5), Lydon stated

> [o]n the way back to the car, Mr. Bellucci asked me what this was about. I told him that I would explain more once we got inside the vehicle, and he -- I gave him his *Miranda* warnings. He was placed in the back, the rear driver's side of that vehicle. I got into the back seat, sat directly next to Mr. Bellucci.

(Hr'g Tr. 12:6-11.) Lydon then provided additional details: once in the car he gave Bellucci copies of the arrest warrant and search warrant for his phone; Detective Condrad was sitting in the front passenger seat at the time; soon thereafter Detective Shelly got into the vehicle next to Lydon; and Lydon gave Bellucci his *Miranda* warnings. (Hr'g Tr. 12:21-13:22.) When asked to provide details about the *Miranda* warnings, Lydon responded,

> [s]o, we're in the back seat of the vehicle. It's always common that the first thing that I do before I ask anybody any questions that has to do anything with any criminal investigation, and that's, read them their *Miranda* warnings. I

4

wanted to talk with Mr. Bellucci. I wanted to talk to Mr. Bellucci about the investigation, so I read him *Miranda* before asking him any questions.

(Hr'g Tr. 13:24-14:5.) Lydon testified that there was no impediment to Bellucci's hearing the rights Lydon had read, Bellucci confirmed that he understood the rights, and Bellucci told Lydon that he wanted to cooperate before Lydon began asking questions. (Hr'g Tr. 15:14:8-16:17.)

Regarding the later interview at the District Attorney's office, Lydon testified that he and Detective Shelly took Bellucci into an interview room, sat down with Bellucci and "kind of just had a little bit of rapport back and forth, and then I explained to him that I'm -- I've already done it verbally, but I'm going to give you your *Miranda* again in a written form." (Hr'g Tr. 18:3-9.) Lydon further testified that Bellucci had no reaction when Lydon said he had previously given the *Miranda* rights verbally and Bellucci remained cooperative during the entire interview. (Hr'g Tr. 18:12-16.) After a short video of the beginning of the interview at the District Attorney's office was played, Lydon was asked to reiterate what he told Bellucci at the outset of the interview and responded "I told him that I previously *Mirandized* him in the vehicle, but that I'm going to do it again." (Hr'g Tr. 18:17-19:24.)

On cross-examination, Defendant's counsel asked Lydon whether he was having a conversation with Bellucci as he escorted him back to the vehicle, and Lydon responded "I wasn't asking him anything -- no, I think he asked me, What's going on? Or What am I under arrest for? I said, Let me get you back to the car and we'll talk." (Hr'g Tr. 7-11.) Questioning about *Miranda* warnings followed:

5

Q. Okay. And a point of clarity because you talked about how you gave him *Miranda* warnings in the vehicle, correct?

A. Yes.

Q. But when you were testifying on direct examination, you first said that you gave him his *Miranda* warnings prior to putting him in the vehicle. Do you recall that?

A. No.

Q. So if -- and the record will reflect what it reflects, but if you said that, that was incorrect?

A. No. He was given his *Miranda* warnings inside the vehicle.

(Hr'g Tr. 25:18-26:3.)

On redirect examination, Lydon confirmed that his incident report documented that Bellucci "was verbally provided *Miranda* in the back of that unmarked vehicle." (Hr'g Tr. 35:22-36:7.) On recross, Defendant's counsel asked if Lydon "was not accurate or truthful" when he stated in the incident report that Detective Shelly and Detective John Munley were with him in the vehicle. (Hr'g Tr. 37:4-10.) Lydon responded that counsel was correct: "Detective Condrad and Detective Munley bear a striking resemblance, and that was my mistake." (Hr'g Tr. 37:11-13.)

Detective Condrad testified that he got into the front passenger side of Zech's vehicle and heard Lydon give Bellucci the *Miranda* warnings. (Hr'g Tr. 44:24-45:5.) He also testified that, after Lydon read Bellucci the warnings, he specifically heard Lydon ask Bellucci if he understood the warnings and if Bellucci wanted to speak with him, and he

6

heard Bellucci express his desire to cooperate. (Hr'g Tr. 45:14-24.) Condrad stated that he "believe[d] [Shelly] got into the front driver's seat" of the car and later confirmed this belief. (Hr'g Tr. 49:3-8.) On cross-examination, Defendant's counsel asked Condrad when he was first asked about Bellucci being *Mirandized* and Condrad responded "a couple of days" before the hearing. (Hr'g Tr. 50:12-20.) Condrad confirmed that the events at issue occurred over a year before the hearing. (Hr'g Tr. 50:21-22, 52:11-14.)

Detective Shelly testified that he got into the rear of the vehicle next to Lydon. (Hr'g Tr. 62:16-17.) He believed that he closed his door and confirmed that the door next to Bellucci was closed. (Hr'g Tr. 62:18-22.) Shelly testified that "[a]t one point, [Lydon] was advising [Bellucci] of his *Miranda* rights. Mr. Bellucci was very cooperative throughout, and, afterwards agreed to speak with law enforcement." (Hr'g Tr. 63:6-8.) Regarding *Miranda* warnings, Shelly confirmed that he "did not catch the whole thing" but he heard the beginning and that Bellucci wanted to cooperate. (Hr'g Tr. 63:16-64:18.) Shelly explained that, at some point during the investigation, he was trying to get in touch with the Monroe County Correctional Facility to let the warden know about Bellucci's arrest so he was not completely focused on what Lydon was doing. (Hr'g Tr. 63:22-64:1.) He was not sure whether the conversation with the warden took place while he was inside or outside the car. (Hr'g Tr. 64:6-10.) After being shown the beginning of the interview at the District Attorney's office, Shelly was asked about Lydon's initial statement to Bellucci:

> Q. Did you hear in that video the audio when Detective Mike Lydon said, "I *Mirandized* you in the car. I'm going to do it again," did you hear him say that?

7

A. I did.

Q. Did that cause you to stop and say, Woah?

A. No.

Q. Why?

A. Because he's saying exactly what he did.

Q. When Detective Lydon said that to the Defendant in the context of, I'm going to do this again, did that elicit or did you have an opportunity to make any observations that caught your attention from the Defendant?

A. No.

Q. What observations, if any, did you make of the Defendant, when Detective Lydon said, "I *Mirandized* you in the car. I'm going to do it again"?

A. Basically, implementing that he understood and he's continuing to cooperate.

(Hr'g Tr. 68:7-24.)

On cross-examination, Shelly confirmed that he never documented in a report that Bellucci was *Mirandized* in the car and he was first asked about the issue in the week before the hearing. (Hr'g Tr. 69:10-70:5.) Shelly also confirmed that he was in the rear of the vehicle, he had no doubt that he heard at least part of the *Miranda* warnings, and if any door or window was open when Bellucci was being *Mirandized*, it would have been his door. (Hr'g Tr. 70:13-73:6.)

Santino Bellucci testified that, after being placed in the vehicle, Lydon said

8

> [y]ou're about to make the biggest decision of your life. You have two choices, you know, One, you could work with us. And at that point, I proceeded, you know, I said, Yes, I'll work with you guys, as he was finishing the remainder of it, you know, so I wasn't -- I'm not sure if he said along the lines of, You're screwed or You're done or what. I'm not exactly sure his words, but there was a second choice.

(Hr'g Tr. 76:18-25.) Bellucci added that Lydon or other officers asked him questions about his involvement in narcotics activity while he was in the vehicle. (Hr'g Tr. 77:9-18.) Bellucci also testified that no officer told him that he had the right to remain silent but "[t]hey said I have -- the only time that right was ever involved, he said -- right before he gave me them two choices, he said, You know you don't have to speak to me, if you don't want to." (Hr'g Tr. 77:24-78:4.) The following exchange then took place:

> Q. Other than saying, "You don't have to speak to me, if you don't want to," did anybody advise you that you have the right to an attorney?
>
> A. No.
>
> Q. Did anybody advise you that if you couldn't afford an attorney, that one would be provided to you?
>
> A. No.
>
> Q. Did anybody advise you that even if you start speaking, you can, basically, stop the interview at any time?
>
> A. No, not until we reached the Lackawanna County District Attorney's Office, that I remember.

(Hr'g Tr. 78: 5-15.)

On cross examination, Government counsel confirmed that Bellucci did not have any mental disabilities or hearing problems, that Bellucci had been arrested previously, that he

9

knew about *Miranda* warnings, and that he had not been scared when he was being interviewed. (Hr'g Tr. 81:16-83:8, 85:1-10.) Bellucci testified that he understood that *Miranda* warnings have to be read "as I'm being arrested for a crime." (Hr'g Tr. 83:13-14.)

Before viewing the video interview, Bellucci acknowledged that he and his counsel had discussions about it and he was familiar with the entirety of what the video shows. (Hr'g Tr. 83:22-84:7.) After hearing the portion of the recorded interview where Lydon said "the worst part is over. I *Mirandized* you in the car. I'm going to *Mirandize* you again," Bellucci said he heard "I *Mirandized* you earlier, and I'm *Mirandizing* you now." (Hr'g Tr. 86:1-5.) Bellucci said he "didn't hear anything in the car" and he took "earlier" to be "right before I saw the DA" in the other room. (Hr'g Tr. 86:7-10.) When asked to confirm that he said Detective Lydon *Mirandized* him at the DA's office before he entered the interview room, Bellucci said "I was under the impression, yes." (Hr'g Tr. 86:12-15.)

After the recording of the interview was played again, Bellucci confirmed that he heard Lydon say "I *Mirandized* you in the car." (Hr'g Tr. 90:12-22.) Bellucci acknowledged that he had not reacted to Lydon's statement during the interview and said that he did not do so because he had "signed papers regarding my rights in the room next door." (Hr'g Tr. 91:1-9.) Government counsel then established that what Bellucci referred to were consensual forms regarding cooperation against his sources. (Hr'g Tr. 91:11-20.)

Later in the cross examination, Bellucci was questioned about what Government counsel called the "pivotal issue" for the hearing and about his familiarity with *Miranda* warnings:

> Q. Okay. So, just so I'm clear, the pivotal question here is whether or not you were verbally advised of your *Miranda* in the car, right?
>
> A. Correct.
>
> Q. And just so we're clear, you know full well what *Miranda* is, you testified to that?
>
> A. Correct.
>
> Q. Of course you know, right?
>
> A. Um-hum.
>
> Q. And you agreed with everything else that these officers said, except the *Miranda*, right?
>
> . . . .
>
> Q. Right?
>
> A. Correct.
>
> Q. The one thing, though, is you say, nobody ever *Mirandized* me in the car?
>
> A. Correct.

(Hr'g Tr. 96:20-97:13.)

The following exchange occurred on redirect examination:

> Q. And so, when you were interviewed by the district attorney prior to that interview on the video, did they discuss some of your legal rights with you?

11

A. Not as -- I can't -- not -- not fully, that I could remember. I only do remember him asking me if I wanted to speak to him about anything.

Q. Well, do you recall him having you sign the -- him or one of the detectives having you sign the paper?

A. Yeah, I remember having to sign paperwork, and he was in and out pretty quick.

Q. What was your understanding of what you were doing by signing that paperwork?
A. That I was signing my -- you know, the -- my rights, that I was being arrested, that I was doing a controlled buy, and...

Q. And did they tell you, you had the right not to enter into that agreement?

A. The only time that I remember them -- anything involving, you don't have to speak to us or do anything, was in the vehicle.

Q. When you talked about on cross examination your understanding of what the detective asked you, saying you were *Mirandized* previously, do you understand that to mean in that room prior, with the DA?

A. Yes, that was -- that's the understanding I was under.

Q. And that was about 10 minutes before that taped interview?

(Hr'g Tr. 101:9-102:9.)

On recross examination, Bellucci confirmed that nothing in the consent form he signed talks about his *Miranda* rights. (Hr'g Tr. 105:5-8.)

### III. ANALYSIS

Defendant maintains that, because he was not *Mirandized* before he made incriminating statements while in the back of the police vehicle following his arrest, those statements and the subsequent incriminating statements made after he was *Mirandized* at

12

the Lackawanna County District Attorney's office both confessions must be suppressed: the first because it was given in the absence of *Miranda* warnings, and the second because it was tainted by the first and not sufficiently independent or voluntary. (Doc. 111 at 7.) Bellucci further maintains that any evidence retrieved as a result of the confessions must be suppressed as fruit of the poisonous tree. (*Id.*) The Government responds that the statements should not be suppressed because evidence shows that Bellucci was *Mirandized* before he made any incriminating statement. (*See, e.g.*, Doc. 156 at 6.) The Court concludes that evidence of record supports the conclusion that Bellucci was *Mirandized* before he made the incriminating statements at issue.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.  "[T]he privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by law-enforcement officers during in-custody questioning.'" *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990) (quoting *Miranda v. Arizona*, 384 U.S. 436, 461 (1966)). To ensure a person's Fifth Amendment rights are protected, *Miranda* held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. at 444.  As a procedural safeguard, a person being questioned must be issued the "*Miranda* warnings":

13

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

*Id.*

As explained in *United States v. Rought,* 11 F.4th 178 (3d Cir. 2021),

> [a] waiver of the *Miranda* rights must be voluntary, knowing, and intelligent considering the totality of the circumstances. [*United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989)] (citing *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602). A waiver is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). In the voluntariness inquiry, "[a] suspect's background and experience, including prior dealings with the criminal justice system, should be taken into account." *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005). A waiver is knowing and intelligent if "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Spring*, 479 U.S. at 573, 107 S.Ct. 851 (quoting *Burbine*, 475 U.S. at 421, 106 S.Ct. 1135*); see also Berghuis v. Thompkins,* 560 U.S. 370, 382-83, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). If the Government "shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384, 130 S.Ct. 2250.

*Rought,* 11 F.4th at 187.

Having fully considered Defendant Bellucci's reasons for discounting the credibility of the testifying officers (*see* Doc. 155 at 2-5), the Court finds that the reasons proffered do not undermine the officers' consistent testimony and concludes that the Government has shown that a *Miranda* warning was given in the car, Bellucci understood it, and Bellucci willingly continued to talk with law enforcement. As will be discussed below, with minor variations,

Lydon, Condrad, and Shelly consistently testified that Bellucci was in the backseat of Zech's vehicle when Lydon gave the *Miranda* warnings and Bellucci expressed his understanding before agreeing to continue to talk with Lydon, *see supra* pp. 4-9, and both the incident report and recorded interview corroborate the hearing testimony.

As to Detective Lydon, Defendant's reliance on "inaccurate information about who was in the vehicle for the alleged *Miranda* warnings" in the Incident Report (Doc. 155 at 5) is not evidence of a lack of credibility. The fact that Lydon mistakenly identified the third officer in the vehicle as Detective John Munley rather than Detective Corey Condrad, *see supra* p. 6, shows a factual error but the error does not implicate Lydon's credibility. Defendant's counsel did not discredit Lydon's statement that "Detective Condrad and Detective Munley bear a striking resemblance, and that was my mistake" (Hr'g Tr. 37:11-13). Further, the record does not show extensive interaction between Lydon and Condrad at the scene—it appears that their first encounter occurred in the car where Condrad was in the front seat when Lydon got in the car with Bellucci, and there is no record of any contact after the initial interview when Lydon left the car and drove separately to the District Attorney's office.[3] (Hr'g Tr. 13:11-17:19.)

Defendant's assessment that Lydon "changed his story" about where he first provided *Miranda* warnings (*see* Doc. 155 at 5) is not supported by the record. The alleged discrepancy is Defendant's claim, without citation, that "Lydon initially testified that *Miranda*

---

[3] Lydon's incident report merely notes the presence of two other officers in the car (Munley and Shelly) with no further reference to Munley. (See Doc. 120-1 at 1.)

15

was provided outside the vehicle" and later "claimed it was provided inside the vehicle." (Doc. 155 at 5.) The Court assumes the following is the initial testimony to which Defendant refers:

> [o]n the way back to the car, Mr. Bellucci asked me what this was about. I told him that I would explain more once we got inside the vehicle, and he -- I gave him his *Miranda* warnings. He was placed in the back, the rear driver's side of that vehicle. I got into the back seat, sat directly next to Mr. Bellucci.

(Hr'g Tr. 12:6-11.) While Defendant apparently construes this statement as a precise step-by-step timeline of a sequence of events, the Court does not. Rather, Lydon's reference to *Miranda* immediately after telling Bellucci he would further explain things in the car can just as easily be considered a fast-forward to what occurred *in* the car. Further, Lydon credibly testified on cross examination that he had not previously testified that he had provided *Miranda* warnings while walking back to the vehicle. *See supra* p. 6 (quoting Hr'g Tr. 25:18-26:3). The timeline confirmed by all testifying officers, i.e, that Lydon gave the *Miranda* warnings inside the vehicle, also makes common sense: *Mirandizing* Bellucci in the car would be consistent with the fact that Lydon did not want to give Bellucci details about the situation while walking on the side of a busy interstate highway. The timeline consistently provided during testimony is also consistent with Lydon's statement in the Incident Report that Bellucci "was placed in the backseat of an unmarked vehicle, was made aware of his *Miranda* Warning which he waived, and agreed to speak with this investigator." (Doc. 120-1 at 1.)

16

Defendant Bellucci first seeks to undermine the credibility of Detectives Condrad and Shelly because of a general inability to recall events and the fact that they had not previously documented anything about the interaction which had occurred a year before the hearing. (*See* Doc. 155 at 4.) More specifically, Defendant points to the following: 1) Condrad's testimony that Shelly was in the front driver seat conflicts with the testimony of Lydon and Shelly that he was in the backseat; 2) neither Condrad nor Shelly could recall whether the car doors and windows were open; and 3) Shelly was not focused and "just 'believed'" that he heard part of the *Miranda* warning. (*Id.*) While testimony about doors, windows, and Shelly's location are not consistent, these are not matters of importance that would be memorable a year after the incident and, as such, they are not indicative of a lack of credibility. Notably, Defendant is incorrect that Shelly "just 'believed'" that he heard part of the *Miranda* warnings. Rather, Shelly confirmed that he had no doubt that Lydon read Bellucci his *Miranda* rights while sitting next to Bellucci in the car. (Hr'g Tr. 73:1-7.) In sum, even if the Court were to find that that Shelly's and Condrad's memories of events diminished with the passage of time, their testimony did not exhibit any inconsistency that could support a finding that Shelly or Condrad was not credible.

Finally, Defendant's attempt to diminish the evidentiary value of the recorded interview (*see* Doc. 155 at 5-6) is not persuasive. Bellucci seeks to attribute his acceptance of the statement that he had been *Mirandized* in the car to the cooperation agreement which immediately preceded the interview. *See supra* pp. 10-12. While Defendant posits that this

17

is "a valid explanation to rebut the Government's claim" (Doc. 155 at 5), the Court disagrees. It is not credible that Bellucci misheard the critical phrase "in the car" to be "earlier" when he was questioned after seeing the recorded interview. *See supra* p. 10. It is not credible that someone who had been arrested on a previous occasion and clearly understood the importance and impact of being *Mirandized* would think he had been *Mirandized* when he agreed to cooperate with law enforcement regarding his sources. Bellucci's testimony acknowledging that nothing in the consent form talked about *Miranda* rights, *see supra* p. 12, underscores this point. Further, Bellucci's testimony on this issue exhibited considerable hesitation and stumbling. *See supra* pp. 10-12.

Contrary to Bellucci's assessment of the validity of his explanation and credibility on the *Miranda* issue, the Court concludes that the Government has satisfied its burden of showing that he was *Mirandized* before he provided any incriminating statements. Bellucci repeatedly acknowledged his familiarity with *Miranda* warnings and specifically said they had to be read "as I'm being arrested for a crime." (Hr'g Tr. 83-8-14.) Lydon memorialized that he had *Mirandized* Bellucci in the vehicle both in the recorded interview and Incident Report (Doc. 120-1 at 1). The officers' testimony on the pivotal issue of the initial *Miranda* warnings was consistent and not undermined by minor discrepancies or uncertainties on insignificant matters.

## IV. CONCLUSION

For the reasons set forth above, the Court will deny Defendant Santino Bellucci's Motion to Suppress Defendant's Statements (Doc. 108). An appropriate Order will be entered.

_____
Robert D. Mariani
United States District Judge